Good afternoon. May it please the Court? My name is Diane Curran, and I represent the San Luis Obispo Mothers for Peace. I'd like to reserve five minutes for rebuttal. This afternoon, I'd like to focus on three issues relating to the lawfulness under NEPA of the NRC's 2007 environmental assessment, which found that the environmental impacts of an attack on the Diablo Canyon spent fuel storage facility were small and therefore did not require the preparation of an environmental impact statement. First, I'd like to talk about why NEPA did not give the NRC discretion to refuse Mothers for Peace's request for a closed hearing on the question of whether the NRC had ignored a whole category of attacks that could have devastating effects on the environment. Second, I'd like to talk about why the NRC's claim that it did in fact consider the types of attacks of concern to the Mothers for Peace on the record is not correct, and in fact there is no record evidence that the NRC did consider the Mothers for Peace's concerns. And finally, I'd like to talk about why the NRC is incorrect when it argues that the adequacy of its environmental assessment under NEPA is beyond the scope of this Court's review. And before I launch into that, I'd just like to start by saying this is not an academic debate for the Mothers for Peace. The reason that we are back before this Court is the Mothers for Peace still believes that the NRC should be doing an environmental impact statement because the potential impacts of an attack on this facility are significant, and of course the chief purpose and the practical effect from the Mothers' point of view is that an EIS would consider various alternatives, such as design modifications, that could substantially reduce the risk of significant adverse off-site impacts. With respect to the first issue, the Supreme Court recognized in Weinberger that NEPA has two prongs, and the NRC has effectively tried to conflate these two prongs into one. One of the prongs, the one that the NRC focuses on, is the public disclosure prong. It is an essential requirement of NEPA that the information that is generated through the NEPA decision-making process to the extent allowed by FOIA must be disclosed. But NEPA has another equally important prong, which is, as the Supreme Court said in Weinberger, not necessarily coextensive, and that's the decision-making prong. There's two sentences in NEPA that are important. They are in section 102, 42 U.S.C. 4332. First, at the very end of 4332C, the statute says that the environmental decision-making document must accompany the proposal through the existing agency review process. And then if you go back up to the very beginning of section 4332, the statute says that NEPA must be complied with to the fullest extent possible. Now, this is a very, the NRC is an unusual agency in that its decision-making process includes an adjudicatory hearing under section 189A of the Act. That was not the case in Weinberger, and it's not the case with respect to most Federal agencies, which simply have a notice and comment process, and that's how the EA, the environmental assessment and the environmental impact statement is generated. The NRC is unique because it has this hearing. The hearing is not discretionary. If an interested person meets the requirements for demonstrating standing and pleading and admissible contention, that person is entitled to a hearing. And section 189A is further modified by section 181, which provides that if a section 189A hearing or other proceeding involves classified or other security-related information that has to be protected, then the NRC must establish procedures for protecting that information while at the same time minimizing the adverse effects on the parties to the proceeding. I don't understand exactly where you're going with this, because if there is a FOIA exemption that covers the information that you want to know in the hearing, there's really no purpose to having a hearing. Well, the FOIA exemption applies to public disclosure. That is to the general public. But interested members of the public under section 189A are a smaller group of people. Those are people with standing, first of all. Just a second. If somebody makes a FOIA request and it's an individual and they personally want to know something individual, normally an agency can say this is covered by an exemption and, therefore, I don't have to give it to you, not just I don't have to give it to the general public. I don't have to give it to you. Isn't that the way FOIA works? Well, FOIA governs general public disclosure. And the cases like the ---- But it covers any disclosure to a particular person, not just ---- Well, yes, but that's ---- If it's entitled to be, if it's exempt, then it doesn't have to be disclosed to anybody. If it's exempt, it does not have to be disclosed to a requester under FOIA. And as the court ruled in Maricopa, then once that person gets the document under FOIA, that's a public document. That document, it is not possible, for instance, the Maricopa case, which concerned nesting locations for goshawks. Once that one person gets the document, it's a public document, there's no ---- you can't sign a confidentiality agreement. But if this agency didn't have section 189, I would say, yes, that's the case. We would be out of luck if it weren't for section 189. If the NRC were the Defense Department, say, as in Weinberger, we would be out of luck, because those agencies don't have special procedures which are different from FOIA. FOIA says any member of the public can request a document. The NRC says only certain members of the public can get a hearing. And Congress specifically provided that those members of the public who could show they had an interest in the outcome of the decision-making process should be able to get a hearing even if the information involved was classified or safeguards or other security information. Now, that's not to say that they could get it just willy-nilly under any circumstances. The NRC has procedures for that, and those are found in subpart I of 10 CFR, part 2. So in other words ---- Roberts, I mean, what you're making the leap for, you're making the leap from the idea that you get a hearing and that you get disclosure of the documents. And it seems to me those two concepts aren't necessarily coextensive. Tell me why you think they are. Well, I think the word disclosure is a word that implies public disclosure. And what we are talking about here is a closed hearing where the information is protected through procedures that require the participants in a hearing to maintain its confidentiality. I think the word ---- But there's nothing in the statute of regs that really says that you're entitled to that, is there? In the Atomic Energy Act, there is no ---- the Congress told the NRC, you shall establish procedures that will allow participants in a section 189A hearing to participate with minimum impairment due to the fact that some of the information is classified or safeguards, et cetera. So the NRC has done this balancing in the procedural requirements in subpart I to part 2. It's a nondiscretionary part of the Atomic Energy Act that the NRC must establish must allow interested members of the public, not just anyone, but someone who can show standing, someone who can submit an admissible contention. Because the Congress, in taking away regulatory authority from the states in the 40s and 50s, Congress gave the states and the public the opportunity to participate in the decision-making process through hearings, adjudicatory hearings, if they could show that they had met the appropriate requirements. Yes. Well, I gather your argument really is that participation equals a right to disclosure of all documents. Is that right? No, not necessarily. So how are we to gauge that? I mean, the NRC has said we have confidential documents. We're not going to turn them over. That's our process. What's wrong with that from, in terms of our deferential review of the agency? Well, let me just make clear. The NRC completely refused to apply its subpart I procedures in this case. If they were to have been applied, the way it would work is, first of all, the participants would have to have security clearances. I have a security clearance. We have an expert, Dr. Edwin Lyman, who has a security clearance, and he has the appropriate expertise. That's the first requirement. The second requirement is, well, first of all, if a classified or safeguards document is introduced by the government into the adjudicatory case, the other participants are entitled to see it. But if there are classified or safeguards documents that, say, the Mothers for Peace considered to be necessary to the preparation of their case, they would have to make a special showing to the NRC that the information was necessary for the preparation of their case. So it isn't just an open-ended, we get to look at any kind of classified information we want. There's procedures to limit the disclosure to either what's being introduced into the adjudication or what the party needs to see. So there are extensive procedures the NRC has to carefully go along and limiting the amount of classified information that needs to be disclosed. But to completely bar us, we were completely barred from addressing these issues, that is not permitted by Section 189 or 181, which must be interpreted in harmony with NEPA. NEPA, I'm sorry. Could you get to the, what I think is like another part of your argument, and that is what they claim they considered they didn't consider? Yes. The NRC said, well, we considered your attack, they called it a scenario, repeatedly. It actually is not one scenario. We were concerned that there's a whole type of attacks which could cause very severe environmental effects that could be accomplished by a variety of scenarios. At any rate, the NRC said, first, it's in the record. But the record that was pointed to were statements by lawyers in an oral argument at the end of the case. That is not record evidence. That is the only part of the case where the NRC said we did look at the types of attacks posed by the militia piece, which is statements by lawyers to the NRC. Second, the NRC said we, we, the Commissioners, three of the Commissioners looked at it as an exercise of their supervisory jurisdiction. But one of the Commissioners wasn't even aware that there was any kind of a group review of this. It appeared to be just ad hoc review by individual Commissioners. That is not, that does not comply with the APA. That is not a record under NEPA. Can we talk about specifically what it was that they didn't consider? I think, maybe I'm understanding this improperly, but I think you're complaining about land contamination not considered. You're considering about Zircaloy. Is that how you say it? Fire is not considered. That, is there something else? Or have I got that right that you think they didn't consider those two things? Yes, but the, yes, you have that right. But the important thing to understand is that how one, how one, how an attack happens really is the deciding factor in the significance of the environmental effects. So, in other words, the NRC said we looked at plausible scenarios and they had very little effect. So, we looked at land contamination, but it was virtually nil because very little radiation escapes a storage cast. Our position was you didn't look at the kind of attack that is really what should be of concern to you, which is the cladding around this fuel is very flammable. If it's set on fire, if the attack is conducted in a way that a fire can be caused in a cask and that a plume can be released from the cask, an atmospheric plume, the cesium in the cask is very volatile. And it can be carried aloft into the atmosphere and go for thousands of miles and cause significant environmental damage. So it all came down to the NRC's refusal to engage Mothers for Peace on what constituted a plausible type of attack, a plausible scenario. It simply said we're not going to discuss this with you because it's classified information or it would involve consideration of classified information. We don't have to. And we can't even get review by a court. Well, why isn't it somewhat of a compelling argument that they don't want to say to you let's talk about that because that's plausible? I mean, you see the problem there? Announce to the world this is a plausible thing to do to this plant. We wouldn't dream of asking them to announce it to the world. That is why we asked for a closed hearing to which we believe we are entitled under NEPA under the requirement that the NRC must use its decision-making process to the fullest extent possible, unless there's some statutory prohibition. There is no statutory prohibition against the NRC using the procedures of Section 189a and Section 181. Was there another problem with your allegations about the zirconium cladding? Yes.  Was that late, submitted? There was one contention which the NRC claimed was late. That was Contention 6. The principal contention was Contention 3, which no argument was made that that was late. And the only reason the NRC said that Contention 6 was late was because it was so much like Contention 3. So it really, it wasn't because we were late, because we got to the agency too late, we waited, we slept on our rights. It was only because Contention 6 was similar to one that had been rejected. So the issue about zirconium cladding was part of a timely submitted Contention 3. Yes. And I see I only have less than three minutes left, and I would like to save some time for rebuttal. Very well. Thank you. Before we start the clock, do you have a time agreement? Yes, Your Honor. Solomon and I have agreed to split the time 13 and 7. All right. Very good. I advise count the table of that. You took out part of my opening statement. You can repeat it if you want. Thank you, Your Honor. Good afternoon. May it please the Court. One thing I would ask you is move the microphones a little closer to you, both of them, just so we can make sure we can hear. Yeah, that one as well. This one? Yeah. Very good. Thanks. Is this better? Yeah. Thank you, Your Honor. Good afternoon. May it please the Court. My name is Charles Mullins, and I will argue today for the Nuclear Regulatory Commission of the United States of America. As noted earlier, I'm joined by Kathleen Sullivan, who represents PG&E. As I just noted, we've agreed to split the time 13 and 7. This Court first heard this case five years ago, almost to the week, in fact. You remanded the matter to the NRC with instructions to analyze the impact of a terrorist attack. In the process, and I'm trying to quote here, you explicitly stated, if you were not circumscribing the procedural options available to us, that security considerations could permit modification of some NEPA procedures and that a Weinberger-style limited proceeding might be appropriate. We took your remand seriously. The staff looked at a group of scenarios of terrorist attacks developed by Sandia Laboratories at Los Alamos, and in a minute I'll walk you through the scenario process. The staff chose the plausible or credible scenario with the most severe consequences and did an analysis of those consequences. It prepared a supplemental liais, it put that out for comment, it reviewed comments, it responded to comments, put out a final liais. The commission then held an adjudicatory proceeding. It took evidentiary submissions, held an oral argument, and it affirmed the staff's finding that there was no significant impact. Now, some of that material was FOIA-exempt material, which NEPA, by its language, and Weinberger, the Supreme Court's decision, exempt from release. But the fact that the commission relied on those matters should not undercut or undermine the commission's findings. Now, I'd like to explain there's been some question about how the staff chose its scenario, and I'd like to give you just a brief run-through of how that happened. In the excerpts that we filed, supplemental excerpts, we have a list of the scenarios prepared by the Sandia Laboratory. Then there was in the excerpts that Ms. Curran submitted, she has a couple. which has the first review of those scenarios, and attached to that at 151, ER 151, you have a classified threat assessment, which the NRC received from the intelligence community. In answer to your next question, I do not know which agency this came from. If you look at the bottom of the page, it's marked secret, no for MR, which means it cannot be shown to any foreign national, and it's a mandatory review. Some documents can be declassified automatically after so many years. This document requires a mandatory review. There were several, and the staff did another review, which is back in our excerpts at 104. And if you will turn to page 108, I believe, you'll see at the top of the page it says, SFPO Scenarios TAS Assessed Remote and Speculative. That's Spent Fuel Project Office, and those are scenarios involving spent fuel casks. TAS is Threat Assessment Section, and it says those scenarios are remote and speculative. At the bottom of the page, it says Scenarios Assessed as Possible. So some scenarios were assessed as remote and speculative and some as possible. Now, if you go back to Ms. Curran's excerpts at page 124, it refers to the Dornan memo that I just cited, and it starts listing the 16 scenarios. And it has seven scenarios listed as remote and speculative. And on the next page, it has four more scenarios that are eliminated by basis of the cask design or design basis threat, or the licensing basis for the cask. Now, that leaves at least five scenarios that were not considered remote and speculative. And staff, this was in 2005, December of 2005. In 2007, the commission directed Can we just stop a second because I got a little Oh, I'm sorry, ma'am. No, there's some noise, and I lost some of what you were saying. The four more, you said something about licensing. Yes, at the top of page 125, it says Scenarios that were already covered by the licensing basis for storage cask design are not feasible at a storage site. Oh, okay. So those scenarios were removed. That left you with five scenarios that were not remote and speculative. And so a year and a half later Excuse me, are these scenarios all wrong to attend? I'm sorry, Your Honor. I'm not sure we're well connected. I'm getting an echo. Are you getting an echo? Slightly, but we can hear you. Now we can hear you. All right. My question is, are all of these scenarios you're describing related to a terrorist attack? I believe they are, yes, Your Honor. And so you're eliminating certain forms of a terrorist attack. That's correct, based on the classified threat assessment. Now, the five scenarios, if you look down at the bottom of that page, it said each scenario was developed to determine the number of attackers, weapons, and the estimate of time required to complete the scenario. And when, in 2007, the staff came back, took those five scenarios, took the scenario with the largest release, and did the analysis of it. Now, in reviewing contention three, which is the contention Ms. Curran primarily argues, the commission said arguing or litigating these alternative scenarios is really impractical. Essentially what the petitioners want to do here is they are challenging the commission's analysis based under the classified threat assessment. They are challenging the selection of the scenarios based on this threat assessment, which is from the intelligence communities. So therefore, in order to challenge it, we would have to put the people from the intelligence community, if you're having a closed hearing, the people from the intelligence community would have to come and explain why this scenario or why this threat is limited as it is. And they would have to explain then why, that would explain why, for example, her scenarios might not be considered. Now, if she says that we did not respond to that, of course the commissioners did. The commissioners, as they said in the last order, which is part of the record, looked at the scenarios, looked at the information supplied by the staff, which is classified or otherwise exempt, and determined that the staff selection of scenarios was reasonable. Excuse me. I'm having a catch my breath here. We're not that scary. No, Your Honor. I'm just a little nervous. That's all. Well, I think we understand where you're going with this and what your point is. I know your time is winding down and I wonder if I could shift topics. Yes, Your Honor. One of the things that concerned me about this case, looking at it, is when we consider strictly a NEPA analysis and we leave aside all the national security issues and the issues peculiar to this agency, we look at what the agency did and there's very little land contamination analysis. In fact, there's no analysis at all of land contamination. Now, normally, if we got that from the Forest Service, we'd say that goes back by return mail. The staff said we considered it, but we didn't analyze it, even within the scenarios that you've described. So tell us why you think that the agency actually took a hard look at land contamination in its analysis. All right. Your Honor, first, what the commission, what the staff did, was they did an analysis of the dose to the nearest resident. Right. In other words, our first, obviously the first thing we would look at is, how is this going to affect the health of the public? Now, five rem or less is generally considered not significant. In fact, that's the occupational dose limit. If your occupational dose is under five rem, then you're safe. So, therefore, you're not going to have any noticeable health effects. You're not going to have any latent cancers. Right. I understand. Go ahead. Now, what staff did next was said, look, we figure the probability of an attack is low. The consequences are low. And, therefore, we, since this being a qualitative analysis, we've made a qualitative analysis that this is going to be a low impact, and even there will be some land contamination. There will not be a large amount of land contamination, and, therefore, since it's a low probability and low effect, we don't have to go through all the mathematical calculations. Right. Now, let me just jump ahead because I think I understand your argument, but I want to make sure. As I understood what the staff did, it said, okay, we have this dose level for the nearest resident, and we can calculate from that human health effects. We can approximate what's going to happen to the soil, perhaps, in terms of human health. I guess what I'm saying is we don't know from this document what impact it's going to have on plants, animals, the environment. And this is a NEPA analysis, not a human health analysis. So tell me why you think it was adequate for the staff just to use a human analysis that had nothing to do with the environment except to say, well, this is likely within the occupational dose and the probability is small. Why is that sufficient? It's sufficient, Your Honor, because it's, as you pointed out in your remand order, the commission was able to do a qualitative analysis, and the staff looked at the dose and said the dose is light. And, therefore, since it's light, we can do a qualitative analysis that the land contamination will be light. Now, to your question of what will it do with plants, animals, and so forth, that is lacking. How would it affect the water table? Is there a seepage issue there? I mean, these are the types of things that we usually see in a traditional environmental assessment. I realize we're in a different area here. I grant you that. I understand. But this is the problem I'm having in assessing whether or not the agency really took a hard look at this particular issue. Your Honor, again, our agency took a hard look, but it took a hard look in a qualitative way and did not get into a quantitative analysis. And I'm afraid that's about all I can say on that. All right. Your time is running down, but I want to make sure everybody's asked the questions they want. So far. I wanted to make one other point, if I could, is that we filed recently a 12J letter on a public citizen case. Yes. All right. I would point out that the information there was involved with the design basis. There was a question about the development of a design basis threat. Much of the information in that case, the threat assessment in this case, either was a part of that case or documents similar to it were part of that. And our point is, if that information is not available in a rulemaking about security matters, why would it be available in an adjudication about NEPA matters? That gets into the problem we point out in our brief. We have numerous NEPA cases which are very broad and would put a lot of material into play, even under a protective order, where the risk of inadvertent disclosure would be great. We have had, as petitioners point out, several security proceedings. But security proceedings are fundamentally different from NEPA proceedings. Security proceedings are focused on one particular aspect of a security program or particular plant measured against a particular NRC standard. So you have very discrete security information involved. In NEPA, again, if you're going to litigate scenarios, you're going to be challenging threat assessment. You're going to have classified NSI material, which, of course, by the way, as we point out in our brief, requires the assent of a third-party agency. In this case, some unknown agency for the threat assessment and the Department of Energy for some of the material from the Sandia reports, which, as you know, any time you look through the Sandia reports and see Exemption 1, that's classified material. That's NSI material. I believe I'm well over Ms. Sullivan's time, and I apologize to her. That's all right. We'll give her a full seven minutes. Thank you very much. Judge Reiner, do you have any questions? No, I'll wait for Ms. Sullivan. All right. As always, an honor and a pleasure to appear before you, Your Honor. Thank you. Good afternoon, Your Honors. Kathleen Sullivan for Pacific Gas and Electric, The Intervener. If I could begin with land contamination, Judge Thomas. I think the record does support the finding of no significant impact on land, and that is because the finding of low dose is really an implicit finding of low land contamination. If there's a small dose, then the radiological material causing the dose is small and the impact on the land is small. I think that the best understanding of the commission's conclusion is that low dose was a proxy for low land contamination. Yes. There's nothing in there that indicates how, why we should allow that proxy, why we should allow that analysis to serve as a proxy, though. There is, Your Honor. And just as a reminder, the NRC treats the entire adjudicatory record, including all the evidence submitted, not just the EA as the basis for the finding, and the commission's own conclusions based on its own internal review. The commissioners reviewed, of course, the nonpublic information. Under commission procedure, all of that is the basis for the finding of no significant impact. And in that adjudicatory record, there's substantial evidence. I would first refer, Your Honor, to the evidence that was submitted by PG&E, in addition to the evidence submitted by the commission staff. In particular, PG&E supplemented the commission testimony, and the commission testimony, of course, was principally from the physicist Ms. Thompson. Ms. Thompson said that the 5-rem dosage would have no discernible health effects. That's in the NRC supplemental excerpts at 73, 74. That's the NRC staff. And then PG&E supplemented that testimony by showing why 5-rem is such a low dosage that it's tolerable in employment contexts and otherwise. That's at PG&E's supplemental excerpts at 9 through 14. Then on top so here's the showing that it has low health effects, the low dose. I grant that it has low human health effects. I mean, I think the record supports that. The question is, does it affect the soils, affect the waters, affect plants, animals? Where's the analysis on that? Well, on that, I'd refer, Your Honor, to PG&E's supplemental excerpts at pages 14 through 16. And this is testimony from principally PG&E expert Mark Mayer that focuses on the specific facts about Diablo Canyon that reduce the environmental impact here. Specifically, he focuses on the plant being large. PG&E controls 760 acres. It's got low population density. It's bounded by the ocean. And it's got limited agricultural activity. So, of course, if there were any kind of significant dose, you'd have no immediate effect on any agricultural activities. The nearest ones are far away. So the analysis of no significant impact on the land can be inferred from all the evidence in the record about what's going on on the land. And in particular, I'd refer you also to the NRC's supplemental excerpts at page 84, because that's where there's crucial evidence about the dispersal. If there ever were any kind of release of radioactivity into the air, it would settle quickly on land. And as it moved downwind, it would be dispersed. And anyone downwind would be exposed to lower dosages. So it's not just the finding about the 5 rem exposure to the person who's 1.5 miles away. There's significant evidence in the record, both from the NRC experts and the PG&E excerpts, about dispersal and about the limited effect it will have on the land given the proximity to the ocean. Half of the facility faces the ocean, and there will be dispersal over the ocean, and that will limit the effect on the land. So we think that had the commission actually taken into that sentence Your Honor referred to, all of this evidence, it could have said, and we conclude from the evidence in the record that there was reason to think there will be no significant land contamination. So we think it would be unnecessary to remand. If they could have taken that into account and could have concluded, but didn't, where are we? If the commission did not decide that there would be no significant effect upon land, but could have concluded that, where does that leave us? Well, Judge Reinhart, we think there's no point to a remand because the evidence in the record is sufficient for the commission to have concluded no significant effect. And they did state their conclusion of no significant effect on latent health of humans or on the land. They stated their conclusion. The evidence supports it. So we think it's unnecessary to have a remand for further process on that issue. In other words, the commission did not reach the issue. The commission clearly admitted the contention about land contamination and rejected it determining that there was no significant impact on the land. And that goes back to Judge Rustani's question earlier. You wanted to know what's the difference between the land contamination issue and the land and health, latent health effect issue, and zircaloy issue or zirconium cladding. Those are two synonyms, the same term. That's a bit different, Judge Rustani, because on zircaloy cladding, that goes to the Petitioner's Contention 3, which was not admitted. And it was not admitted for the reasons Mr. Mullins just explained. The commission decided that the staff had properly determined what were plausible threat scenarios, and it considered taking this panel's, this Court's prior decision into account. It took very seriously the need to consider plausible scenarios, and it did consider plausible scenarios involving, and this is at ER 62 to 63, large aircraft impacts similar to the attacks on 9-11 and ground assaults using the adversary characteristics. That's the process Mr. Mullins was describing. Having decided that to look at the environmental impact of these plausible threat scenarios, the commission decided it was not going to consider the zircaloy fire alternative threat scenario in specific or any other threat scenario because it had taken a worst-case look. It had taken a look at the worst case of the greatest radiological exposure and determined, as we just discussed, that it would not have a significant impact. And so it ruled out considering other scenarios. But, again, there is evidence in the record to show why a zircaloy fire scenario is implausible. And PG&E in particular submitted very extensive evidence to suggest why it is implausible that in a terrorist attack there could be a breach of the cask that would lead to a hot enough fire to keep the material in the cask burning by burning through the zircaloy cladding. And I would refer you here to the evidence. So that is, if you ask the question, was there evidence to support a conclusion that a zircaloy fire was implausible, the answer is yes. The adjudicatory record has ample evidence, and I'd refer you in particular to the evidence in the NRC supplemental excerpts at 84 to 85 and the evidence in the PG&E supplemental excerpts at 3 to 5. That's where you can find ample evidence about how robust the casks are, 30 inches of concrete surrounded by two layers of steel secured against tornadoes, wind-driven missiles, high-energy lightning, rugged cylindrical structure, and the improbability that someone could breach it in a way that would produce such a hot fire. So the zircaloy contention wasn't admitted, but there is evidence to support why such a scenario is implausible. And that brings me to just the last point, if I could just speak briefly on nondisclosure. Judge Rustani, you're absolutely right that there's no point to a closed hearing if the FOIA exemptions properly apply to the classified and other security-related materials that were not disclosed, and there's no point to having a closed hearing about those. Now, just a few points. NEPA governs here. And you heard a lot from Ms. Curran about other aspects of the statutory scheme. But what we're focusing on here is NEPA. And, of course, FOIA exemptions govern NEPA. And that's clear from Weinberger. And the commission is not required to disclose or to have any sort of hearing procedure about material that's properly publicly withheld. You might think of it this way. Weinberger went so far as to say that the government didn't need to disclose even the EIS about the environmental impact statement about possibly stored nuclear weapons. Here the commission has gone so much farther. You have a public environmental assessment that discloses a great deal of the reasoning here. You have a disclosure of as much about the security concerns and the environmental impact as is consistent with keeping the commission's national security-related information nonpublic. And the commission is entirely within its discretion in withholding any further information. Under Weinberger, I'd refer you to 10 CFR 51.104. That's the provision that gives the commission great discretion over how to fashion its procedures. And I think Ms. Curran was quite incorrect to suggest that Section 189 of the Atomic Energy Act entitles her to any particular hearing procedure. Au contraire. The procedures that the commission has to follow here are very much up to the commission's discretion. But even if you thought, well, gee, the commission ought to have really made a finding here about why it can't disclose this information. After all, if we were under the Atomic Energy Act, we'd be under Section 181. We'd be under then the regulations interpreting 181. And that would take us to 10 CFR 2.905. 10 CFR 2.905 says that the commission doesn't have to disclose information if it determines that granting access will be inimical to the common defense and security. Now, here we submit that the commission gave a de facto inimicality ruling. If you look to excerpts of record 18 and 19, that's where the commission says, we have really looked at these concerns and we've decided that any benefit to be gained here from further disclosure is outweighed by the risks inherent in disseminating security-related information, even under a protective order. So just to summarize, we think NEPA applies, therefore FOIA exemptions govern. You don't even get to the Atomic Energy Act 189 or 181 here. NEPA governs all agencies. FOIA exemptions don't vary with agency. NEPA is the statute that governs here. But even if the AEA applied and even if you wanted to say, well, did the commission give a good reason for nondisclosure, we think it did. We think it met a kind of de facto inimicality test. And it said we do not believe that it would not be inimical to disclose this information. And we agree with Mr. Mullins. PG&E agrees with Mr. Mullins that to the extent that that kind of information was withheld in the setting that this Court approved in Public Citizen, A4308 applies here in a NEPA setting. If there are no further questions, thank you very much. Roberts. Let me make sure. Judge Reinhart, do you have any further questions? Thank you very much. Thank you very much. I'd like to just make a couple of points. Counsel for the NRC said the NRC took this scenario with the largest release and assessed its consequences. And I believe Counsel for PG&E said it was a worst-case analysis. That's not correct. The NRC took the scenario that it secretly deemed to be plausible that had what it thought was the largest consequences and assessed that, an insignificant release. Our concern here is the NRC overlooked attacks with potentially devastating environmental consequences. And because we were unable to get a closed hearing on what the NRC considered to be plausible attacks, there was no way for us to hold the agency accountable unless the Court applies NEPA to require the NRC to consider, to use the decision-making process, the hearing process to the fullest extent possible, using statutorily mandated procedures, such as the hearing procedures in subpart I to 10 CFR Part 2. Second, Judge Thomas, if all the Court does is remand this case for a better discussion of what the contamination consequences of an insignificant release would be, we would consider that to be that we had dismally failed, because what we are concerned about is not a thorough discussion of an arbitrarily selected, low-consequence event. Yes, I understand that. Finally, I'd like to explain why public citizen is distinct from this case. Public citizen concerned rulemaking, in which the Court said the NRC did not have to share classified or security-related information. If you look at 10 CFR 2.901, which is the NRC's regulation that establishes the scope of the subpart I proceedings or procedures, it says the procedures only apply to adjudications. So the issue wouldn't come up in a rulemaking. It's for adjudications. The NRC has made that determination that these procedures will apply to adjudication. There's nothing in subpart I or in Section 181 that says these procedures apply only to Atomic Energy Act-based security cases. It's just this general language, the same way that Section 189 is very general, saying these are the procedures the NRC uses to include interested members of the public in its decision-making process. And finally, the NRC is unique. Weinberger applies to this case in the sense that Weinberger made it very clear that the two prongs of NEPA are not necessarily coextensive. FOIA does not necessarily govern the decision-making part of NEPA. That's a very important part of Weinberger for us. But Weinberger concerned the Department of Defense, which does not have statutorily mandated procedures like the NRC. So the outcome of Weinberger, where the proposal itself was a state secret, is very different from our case where the proposal is a public matter, that everyone knows there is a spent fuel storage facility at Diablo Canyon. And Weinberger is very different from our case in the sense that Weinberger had no in the agency decision-making process. Wow, I still have a minute. No, you're a minute over. You're a minute over. Let me ask you a question that may help you and be part of that minute. Were you saying that if the only basis for a remand was that there was an inadequate description of possible environmental effects on land, you would not enjoy having such a remand? Or, in fact, you would not suggest the panel make such a remand? Yes, because if it's only a matter of basically making some corrections to the environmental assessment, which still concludes the impacts are insignificant, we would consider that a failure, and we would consider that the NRC had escaped without looking at the really potentially catastrophic effects of an attack on this facility. This is not – if you just set off a bomb next to one of these casts, which is what Sandia looked at, it doesn't necessarily start a fire in the cladding. But Dr. Thompson described various means by which any attacker who really knew – you wouldn't try to attack a facility like this unless – if all you could do was blow a hole in the side of the cask and make some of the fuel fall out. You would try to use the characteristics of the cask to cause significant environmental damage. But for reasons that it refused to discuss in any kind of proceeding, including a closed proceeding, the NRC refused to consider that and instead chose a scenario that would do very little environmental harm. We're not interested in an environmental assessment that's made a little bit better. So at the end of the day, if that's the only issue left, you waive it? If that's the only issue left, yes. I'm not saying yes or no, but I think it's helpful to our analysis. I gather that you don't want to remand on that issue. On that issue, no. Okay. And we do understand your other argument. It's just that it's helpful analytically to go through the various scenarios, if you will. Yeah. Thank you all for your arguments. Thank you. The presentation's been excellent, and we will consider the matter submitted for decision. We will retire to confer on it, and then we'll be back to talk to the law students. As I always say, and many of you know this who are arguing, one of our conditions is that we will not take any questions about the arguments today. We're talking about generic matters, and we want to give you that assurance that we aren't going to be chatting about anything that happened today, no matter how much they beg us. We will be in recess. Thank you. Thank you.
judges: Reinhardt, Thomas, Cjj Restani (Cit), J